Filed 7/26/16  P. v. Wiggins CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>GREGORY K. WIGGINS,<br><br>        Defendant and Appellant. | A143183<br><br>(San Francisco County<br>Super. Ct. No. SCN218951) |

Defendant Gregory K. Wiggins appeals following his convictions for multiple counts arising primarily from his procurement of grant deeds transferring real property from two separate victims—both under conservatorship at the time—to him.  He argues (1) certain counts are barred by the statute of limitations, (2) the trial court erred in failing to instruct the jury on the claim-of-right defense, (3) various evidence was improperly admitted, and (4) no substantial evidence supports enhancements alleging he took property valued at over $500,000.  We affirm.

BACKGROUND

*Information*

The operative second amended information charged appellant with eight counts. Count 1 charged him with grand theft of a loan for $540,000, the property of Rosia Hart and World Savings Bank.  (Pen. Code, § 487, subd. (a).)[1]  Counts 2 through 6 alleged,

---

[1] All subsequent section references are to the Penal Code, unless otherwise indicated.

1

with respect to victim Rosia Hart: theft, embezzlement, forgery, or fraud on an elder (§ 368, subd. (d); count 2); filing a false instrument, a grant deed (§ 115, subd. (a); count 3); making a false statement to a notary public (§ 115.5, subd. (b); count 4); identity theft (§ 530.5, subd. (a); count 5); and embezzlement of a $540,000 loan (§ 503; count 6). Counts 7 and 8 involved victim Kenneth Wilson: filing a false instrument, a grant deed (§ 115, subd. (a); count 7); and identity theft (§ 530.5, subd. (a); count 8). As to all counts, the information alleged appellant engaged in a pattern of related felony conduct involving the taking or loss of more than $500,000 (the white collar crime enhancement). (§ 186.11, subd. (a)(2).) It further alleged as to counts 1 through 6 that appellant took property exceeding $200,000. (§ 12022.6, subd. (a)(2).)

*Evidence Regarding Kenneth Wilson*

In 2004, a court appointed a conservator of the person and the estate for Wilson. A conservatorship of the person means the conservator takes care of the personal needs of the conservatee, such as medical needs. A conservatorship of the estate means the conservator takes care of the conservatee's financial matters. Wilson's conservatorship proceedings were initiated because he gave away $70,000 to someone who claimed to be his godson. As of mid-2005, Wilson exhibited behaviors such as having no memory of a meeting that happened one week earlier and believing his long-deceased mother was still alive.

Wilson consistently identified appellant as a long time friend. A case manager for Wilson's conservator testified appellant was present several times when she met with Wilson at Wilson's home. Wilson told the case manager that appellant had made improvements to his home, and the case manager saw evidence of painting inside Wilson's house. Another employee of Wilson's conservator testified Wilson did not have any family or other friends in his life.

Around October 2005, Wilson's court-appointed probate attorney, Judith Hehir, learned that Wilson was attempting to transfer title to his house to himself and appellant. Shortly thereafter, in October 2005, Hehir met with Wilson and appellant. When appellant was present, Wilson told Hehir he wanted to transfer the property to himself

and appellant, but when Hehir asked Wilson outside of appellant's presence whether he wanted to give away his property, he said he was not sure. Hehir told Wilson and appellant that Wilson could not transfer his property while he was under a conservatorship. Appellant said he did not know that but he now understood.

In November 2005, Wilson signed a deed transferring his interest in his residence from himself as the sole owner to himself and appellant as joint tenants. In a joint tenancy, each joint tenant has a 50 percent interest in the property and inherits the other tenant's share. The deed was notarized in the presence of appellant and Wilson, neither of whom informed the notary that Wilson was under a conservatorship at the time. The notary testified that, had she known Wilson was conserved, she would not have notarized the document because conservatees cannot "sign for themselves" to transfer real property.

After learning of this transaction, Hehir met again with appellant and Wilson and was again "very clear" that Wilson could not transfer his property. In December 2005, an attorney for Wilson's conservator wrote appellant a letter informing him that Wilson was under a conservatorship and suffering from dementia, and that appellant could not take property from him without going through the conservator. In January 2006, a lawyer retained by appellant sent a written response to this letter. Wilson's conservator subsequently filed a petition to rescind the grant deed; in December 2006, the deed was ordered rescinded.

Wilson was deceased at the time of trial but a video recording of his 2007 conditional examination was played for the jury.[2] He did not recall signing the 2005 deed or that he was conserved, and believed he had last seen his long-deceased mother that morning. Although he had never thought about making appellant a co-owner of his house, if his mother were no longer alive he might do so.

*Evidence Regarding Rosia Hart*

In May 2006, Rosia Hart was placed under a temporary conservatorship of her estate. Dr. Abraham Nievod, a neuropsychologist, examined Hart in the summer of 2006

---

[2] A transcript of the recording was admitted into evidence.

and testified she had early dementia, impaired memory, and below average intelligence. He concluded Hart was extremely vulnerable to being manipulated and lacked contractual capacity. Hart told Dr. Nievod that she could not maintain her accounts and depended on appellant to handle her financial matters.

Herbert Thomas was appointed as her temporary conservator. In June 2006, Thomas met with Hart and appellant at a laundromat Hart operated in a commercial property she owned on Newhall Street in San Francisco (the Newhall property). Thomas learned that before the conservatorship, Hart and appellant had entered into a business venture to develop the Newhall property. As part of this venture, in 2005 Hart deeded the Newhall property to an LLC. An operating agreement for the LLC showed that Hart contributed all the capital and had all the voting power; appellant contributed "services"; and the economic interests were split evenly between the two. Also in 2005, appellant gave Hart a joint tenancy in a residential property he owned in Hercules (the Hercules property). Hart told an investigating officer in 2011 that appellant gave her the interest in the Hercules property as "collateral" because he had no money to put into their joint venture.

At the June 2006 meeting, Thomas explained to Hart and appellant that he had been appointed Hart's conservator and would be taking over her finances. Appellant was present at the November 16, 2006 court hearing at which Hart's temporary conservatorship became permanent. Four days later, on November 20, 2006, Hart and appellant signed a quitclaim deed transferring title to the Hercules property from Hart and appellant as joint tenants to appellant as his sole property. On January 7, 2007, Hart and appellant signed a grant deed conveying the Hercules property to appellant. A few days later, appellant obtained a loan of $540,000 from World Savings Bank, secured by a deed of trust on the Hercules property.[3]

Hart testified at trial. She met appellant around 2004. Appellant helped her in the laundromat and she trusted him with her bills and business income. Hart testified that

_____

[3] The parties stipulated that the loan payments were current at the time of trial.

4

around 2005 to 2007, appellant would bring her documents to sign and she would sign them because she trusted him. When she signed the deed granting the Newhall property to the LLC, she did not know what she was signing. Hart testified she was with appellant when he removed her name from the Hercules property, but she did not know what the quitclaim deed was when she signed it and she did not recognize the grant deed.

Appellant presented testimony by a police inspector who interviewed Hart in 2011. Hart told the inspector that appellant approached her around 2005 about a business venture involving the Newhall property and she agreed. Appellant told her he had no money but would give her an interest in the Hercules property as collateral. Later, appellant said he was going to take her off the Hercules property and she agreed, assuming he would quit his joint venture in the Newhall property.

*Jury Verdict, Sentencing, and Post Trial Motions*

The jury found appellant guilty on all counts and found true all of the enhancements. The trial court imposed a term of four years on count 2 and an additional five years for the white collar crime enhancement. Concurrent terms of three years, plus concurrent terms of five years for the white collar crime enhancements, were imposed on counts 1, 3, and 7. The court stayed the terms on the remaining counts and white collar crime enhancements pursuant to section 654; the section 12022.6 enhancements (alleging a loss over $200,000) were stricken under section 1385. The court imposed a fine of $1,080,000 pursuant to the white collar crime enhancement. (§ 186.11, subd. (c).)

Shortly after sentencing, appellant filed a motion to dismiss count 1 as barred by the statute of limitations because the information did not allege, and the People did not prove, that World Savings Bank could not have reasonably discovered the theft before February 17, 2007, four years before the prosecution of the crime commenced. Appellant also argued that, if the court dismissed count 1, the white collar crime enhancements as to all counts must be stricken. The court granted the motion to dismiss count 1 but declined to strike the white collar crime enhancements as to the remaining counts or reduce the white collar crime enhancement fine.

5

I. *Statute of Limitations*

Appellant argues Counts 2 through 6 (relating to Rosia Hart) are barred by the statute of limitations as a matter of law or, in the alternative, the trial court erred in failing to submit the issue to the jury. We affirm.

A. *Background*

On November 20, 2006, Hart conveyed her interest in the Hercules property to appellant by a quitclaim deed. Andrew Schultz, the attorney for Hart's conservator, learned of the quitclaim deed on or before December 20, 2006. On January 6, 2007, Hart signed the grant deed conveying her interest in the Hercules property to appellant. On January 17, 2007, appellant obtained the $540,000 loan secured by the deed of trust on the Hercules property.

Schultz testified that he first learned of the grant deed and loan on February 21, 2007. He further testified that, after learning of the quitclaim deed in December 2006, he did not look into other transfers of title on the Hercules property. He explained, "this was certainly a surprise that there had been a deed recorded. We did not expect there to be further activity, particularly a loan, because we had recorded [the conservator's] Letters of Conservatorship on title."[5] The Letters of Conservatorship were recorded specifically in reference to the Hercules property. Schultz continued, "when I record the Letters in the chain of title, what I thought was, 'Well, these Letters are on title. If there's a title company that goes looking, they're gonna see this and they're gonna know there's a conservatorship and Ms. Hart lacks capacity, and they won't undertake any transactions

---

[4] In his reply brief, appellant argues the People's brief should be stricken for exceeding the word limit. Appellant relies on the word limit set forth in California Rules of Court rule 8.204; however, that rule applies to civil appeals. The People's brief is well within the word limit for briefs filed in criminal appeals. (Cal. Rules of Court, rule 8.360(b)(1).)

[5] Letters of Conservatorship are issued by the court following the appointment of a conservator and provide evidence of the conservator's authority.

that involve her.'  So -- and so that's why, because the Letters had been recorded, we thought, you know, she was protected to that extent."

Appellant does not dispute that counts 2 through 6 were based on the January 2007 grant deed and/or deed of trust, rather than the November 2006 quitclaim deed.

B.  *Analysis*

Appellant contends the applicable statute of limitations is four years after the discovery of the commission of the offense or within four years after the completion of the offense, whichever is later.  (§§ 801.5, 803, subd. (c).)  The People do not dispute this is the applicable statute of limitations for purposes of counts 2 and 6, and we will assume, without deciding, that this statute of limitations applies to counts 2 through 6.[6]

"In applying the discovery requirement, '[L]ack of actual knowledge is not required to bring the "discovery" provision . . . into play.  The crucial determination is whether law enforcement authorities or the victim had actual notice of circumstances sufficient to make them suspicious of fraud thereby leading them to make inquiries which might have revealed the fraud.' "[7]  (*People v. Petronella* (2013) 218 Cal.App.4th 945, 956.)  The People have the burden of proving the prosecution is not barred by the statute of limitations by a preponderance of the evidence.  (*People v. Smith* (2002) 98 Cal.App.4th 1182, 1187 (*Smith*).)

Both parties agree that prosecution of these counts for statute of limitations purposes commenced on February 17, 2011, when an arrest warrant issued.  (See § 804.)

---

[6] The People argue the statute of limitations for counts 3 through 5 is five years pursuant to section 801.6.  We need not decide this issue because we conclude, assuming the statute of limitations is four years, no reversible error occurred.

[7] "For purposes of determining whether a particular person's discovery of facts will be deemed to trigger the running of the statute of limitations," the criminal discovery statutes extend to " 'those persons who are clothed with a status imposed by law [such as a victim's] guardian, conservator or equivalent . . . .' "  (*People v. Moore* (2009) 176 Cal.App.4th 687, 692–693.)  The parties both assume, as do we, that Schultz falls within these parameters.

Therefore, the question is whether the offenses could reasonably have been discovered before February 17, 2007.

Appellant first argues the statute of limitations should be triggered by the discovery of the quitclaim deed in December 2006 because the January 2007 grant deed "merely duplicated the same transfer of title" accomplished by the quitclaim deed. As an initial matter, we fail to see how this argument impacts count six, which by its terms is based on the loan, an act that did not "merely duplicate[]" the quitclaim deed. In any event, we reject the argument. The grant deed may have effectively constituted the same transfer as the quitclaim deed, though we note there are differences between the two. (*Klamath Land & Cattle Co. v. Roemer* (1970) 12 Cal.App.3d 613, 618 ["A grant deed unquestionably transfers an after-acquired title" while, "[a]s a general rule, a quitclaim deed does not operate to transfer an after-acquired title"].) Nonetheless, in executing and recording the grant deed, appellant committed a separate act. Appellant has cited no authority for the proposition that the statute of limitations for a separate act starts running *before the act even occurs* simply because it was duplicative of a previous act, and we decline to adopt such a rule.

Appellant next argues the statute of limitations began on the dates the grant deed and deed of trust were executed because the crimes "were discovered, or should have been[] discovered, *before* then." (Italics added.) He relies again on the fact that in December 2006 there was actual knowledge of the transfer of Hart's interest in the Hercules property to appellant. Again, we fail to understand how Schultz did or could have discovered the grant deed and deed of trust before these acts took place.

Finally, appellant argues the question of whether the grant deed and deed of trust could reasonably have been discovered before February 17, 2007, was a question for the jury.[8] Assuming Schultz's knowledge of the quitclaim deed could constitute evidence that he reasonably should have discovered the grant deed and deed of trust before

---

[8] The People suggest appellant forfeited this issue by failing to raise it below; appellant contends he sufficiently raised it. We need not decide the issue because we find no reversible error.

February 17, 2007, we conclude it is not reasonably probable the jury would have so found. (*Smith, supra,* 98 Cal.App.4th at p. 1193 ["the proper standard for evaluating an alleged erroneous failure to instruct on the statute of limitations is the traditional state prejudice standard set out in *People v. Watson* (1956) 46 Cal.2d 818"]; see also *People v. Thomas* (2007) 146 Cal.App.4th 1278, 1290 [reviewing failure to instruct regarding statute extending statute of limitations for error under *Watson* standard], disapproved of on another ground by *People v. Shockley* (2013) 58 Cal.4th 400; but see *People v. Stanfill* (1999) 76 Cal.App.4th 1137, 1154 [reviewing failure to instruct on statute of limitations pursuant to standard in *Chapman v. California* (1967) 386 U.S. 18, 36 (*Chapman*)].) Schultz's uncontradicted testimony was that, even after he learned of the quitclaim deed, he had no reason to suspect further activity affecting title to the Hercules property because Hart's Letters of Conservatorship were recorded and would have been discovered by a title search. In light of this uncontradicted testimony,[9] we conclude it is not reasonably probable the jury would have found that the grant deed and deed of trust could reasonably have been discovered before February 17, 2007. Any error in failing to present the issue to the jury was harmless.[10]

II. *Claim-of-Right Defense*

Appellant argues the trial court committed prejudicial error in refusing to instruct the jury on a claim-of-right defense and the error violated his due process rights. We reject the contention.

"The claim-of-right defense provides that a defendant's good faith belief, even if mistakenly held, that he has a right or claim to property he takes from another negates the felonious intent necessary for conviction of theft or robbery." (*People v. Tufunga* (1999)

---

[9] Appellant does not claim he was precluded from presenting any evidence on this issue.

[10] We reject appellant's contention that the failure to submit the statute of limitations issue to the jury violated his constitutional right to present a defense. As noted above, appellant does not contend there was any evidence relevant to this issue that the trial court excluded, and appellant cites no authority that the failure to instruct the jury on the statute of limitations constitutes a violation of the right to present a defense.

9

21 Cal.4th 935, 938 (*Tufunga*).) "A defendant need not show his mistaken claim-of-right was reasonable. An unreasonable belief that he had a legal right to take another's property will suffice so long as he can establish his claim was made in good faith." (*People v. Romo* (1990) 220 Cal.App.3d 514, 518 (*Romo*).) " '[A] trial court is not required to instruct on a claim-of-right defense unless there is evidence to support an inference that [the defendant] acted with a subjective belief he or she had a lawful claim on the property.' " (*Tufunga, supra,* at p. 944.) " ' "In evaluating the evidence to determine whether a requested instruction should be given, the trial court should not measure its substantiality by weighing the credibility [of the witnesses] . . . . Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused." ' " (*Ibid*.)

Appellant argues there was substantial evidence he held a good faith belief that Hart and Wilson consented to give him their property.[11] With respect to Hart, he points to the testimony that in 2011, Hart told a police inspector she had told appellant he could take her off the Hercules property. He also points to evidence that he solely owned the Hercules property prior to adding Hart as collateral for their Newhall property venture, and that his interest in the Newhall property was voided after Hart's conservatorship. With respect to Wilson, appellant argues substantial evidence is provided by evidence that he and Wilson were close friends, Wilson wanted to grant appellant an interest in his home, and appellant made improvements on the house.

---

[11] At trial, appellant only requested the instruction with respect to Hart. There is a split in authority regarding whether the trial court has a sua sponte duty to instruct on the claim-of-right defense where supported by substantial evidence. (Compare *People v. Russell* (2006) 144 Cal.App.4th 1415, 1429 ["If the defendant relies on a claim-of-right defense or if there is substantial evidence that supports the defense and the defense is not inconsistent with the defendant's theory of the case, the trial court must instruct sua sponte on the defense."] with *People v. Hussain* (2014) 231 Cal.App.4th 261, 269 ["Since the claim of right defense, like accident or mistake of fact, serves only to negate the mental state required for grand theft, . . . the trial court had no duty to instruct sua sponte on it."].) We need not weigh in on the issue because we conclude there was no prejudicial error in any event.

We need not decide whether there was substantial evidence to support the instruction because even if failing to instruct the jury was error, the error was harmless under any standard. (See *People v. Salas* (2006) 37 Cal.4th 967, 984 [noting "[w]e have not yet determined what test of prejudice applies to the failure to instruct on an affirmative defense" and assuming, without deciding, "the more rigorous *Chapman* test applies"].) To succeed on a claim-of-right defense, the jury would have to believe not only that appellant held a good faith belief that Hart and Wilson consented to give him their property, but also that he held a good faith belief that he could effect the transfer of property without going through Hart's and Wilson's conservators. (*Romo, supra,* 220 Cal.App.3d at p. 518 [claim-of-right defense established where the defendant held a good faith belief that "he had a legal right to take another's property"]; *People v. Stewart* (1976) 16 Cal.3d 133, 140 [claim-of-right requires showing that the defendant "believe[d] he was acting lawfully"].)

Appellant does not dispute this proposition but argues the evidence was inconclusive regarding whether he knew Hart and Wilson could not transfer property and, in any event, this was a question for the jury to decide. While we agree with appellant's second point, it does not assist him. The jury necessarily decided this issue in finding appellant guilty, with respect to both Hart and Wilson, of filing a false or forged instrument.[12] The jury was instructed that an element of the charge was: "When the defendant did the act, he knew that the document was false or forged." The evidence was undisputed that the documents were not forged. The only basis for these counts was that the grant deeds were false because Hart and Wilson were under conservatorships at the time and therefore could not legally transfer property. By convicting appellant on these counts, the jury necessarily found that he knew Hart and Wilson could not legally transfer property at the time they signed the grant deeds. Therefore, even if the trial court had

---

[12] The parties dispute whether the jury's verdict on the embezzlement count conclusively establishes the jury would have rejected a claim-of-right defense. We need not decide this issue.

11

instructed the jury on the claim-of-right defense, we find beyond a reasonable doubt the jury would still have convicted appellant of the theft counts.

III. *Admission of Evidence*

Appellant argues certain evidence was improperly admitted and he was prejudiced by the admission. Appellant forfeited many of these challenges by failing to object below. We reject his remaining challenges.

A. *Evidence Regarding Civil Proceedings*

Appellant first points to evidence that the grant deed transferring Wilson's home to Wilson and appellant jointly was subsequently rescinded. The attorney for Wilson's conservator testified to this fact on cross-examination; appellant did not object to this testimony. On redirect, the attorney again testified that the grant deed was set aside, adding that appellant "was ordered to pay costs and fees, which he never did." Appellant objected on hearsay and relevance grounds. The trial court struck the statement regarding fees and costs and instructed the jury to disregard it.

Appellant first suggests any testimony about court orders regarding the grant deed was inadmissible hearsay. He forfeited this argument with respect to the first such testimony by failing to object below. (Evid. Code, § 353, subd. (a); *People v. Pearson* (2013) 56 Cal.4th 393, 438 (*Pearson*).) Although he objected to the second testimony, he suffered no prejudice from any error regarding testimony that the grant deed was rescinded because this evidence was already before the jury. With respect to the new testimony about fees and costs, appellant contends the limiting instruction was insufficient to cure the prejudicial testimony. " 'Juries often hear unsolicited and inadmissible comments and in order for trials to proceed without constant mistrial, it is axiomatic the prejudicial effect of these comments may be corrected by judicial admonishment, absent evidence to the contrary the error is deemed cured.' " (*People v. McNally* (2015) 236 Cal.App.4th 1419, 1428–1429 (*McNally*).) " 'It is only in the exceptional case that "the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions." ' " (*Id.* at p. 1429.) This is not such an exceptional case.

Appellant also challenges testimony that a money judgment was entered against appellant and the LLC regarding the Newhall property. Appellant objected below on hearsay grounds. After the witness testified that he had personal knowledge of the judgment, the trial court overruled the objection. On appeal, appellant renews his argument that the testimony was hearsay. The witness testified only that judgment was entered. Appellant does not dispute the witness's testimony that he had personal knowledge of this fact. While testimony regarding any factual findings contained in that judgment may have been hearsay, no such testimony was elicited. Appellant also argues the testimony was irrelevant. He did not object on relevance grounds below and has therefore forfeited this argument. (*Pearson, supra,* 56 Cal.4th at pp. 437–438 [hearsay objection in trial court not sufficient to preserve claim on appeal that evidence was irrelevant].)

B. *Evidence That Appellant Unduly Influenced Hart and Wilson*

Appellant challenges a variety of testimony he characterizes as evidence that he unduly influenced Hart and Wilson. We reject these challenges.

Appellant argues certain testimony from the case manager for Wilson's conservator was irrelevant, hearsay, and lacked foundation. However, no such objections were raised below during this testimony.[13] Similarly, appellant did not object below to Dr. Nievod's testimony that he became aware of Hart's case after being contacted by Adult Protective Services and Schultz because they were concerned she was a victim of undue influence and they were in the process of filing a conservatorship petition based on their determination she had been the victim of financial fraud. These challenges are therefore forfeited. (*Pearson, supra,* 56 Cal.4th at p. 438.)

Appellant challenges testimony that one witness's understanding, based on reviewing the pleadings in Hart's conservatorship petition, was that the conservatorship was initiated because Hart was subject to undue influence in her financial affairs.

---

[13] Contrary to appellant's suggestion, objections on other grounds are not sufficient to preserve his claims. (*Pearson, supra,* 56 Cal.4th at pp. 437–438.)

Appellant did not object at the time, but at the next recess requested a limiting instruction that the testimony solely reflected the witness's understanding of the pleadings and was not offered for the truth. The jury was so instructed. We are not persuaded that the limiting instruction was insufficient to cure any error in the testimony's admission. (*McNally, supra,* 236 Cal.App.4th at pp. 1428–1429.) Although appellant argues on appeal that the evidence was also irrelevant, this contention was not raised below and is therefore forfeited.

Appellant objects to testimony of a witness's opinion that Hart eventually believed she may have been taken advantage of by appellant. The trial court overruled appellant's hearsay and relevance objections. Appellant renews these objections on appeal. Any error in admitting the testimony was harmless, as Hart testified to substantially the same thing.

Finally, appellant objected to testimony by Thomas, Hart's conservator, that documents included in Hart's conservatorship petition indicated the conservatorship was initiated because of concerns about an individual who had control of Hart's assets. The trial court overruled appellant's hearsay objection. The testimony on its face related only what was in the conservatorship petition. In any event, the jury heard essentially the same testimony from Dr. Nievod, so any error was harmless.

C. *Evidence Involving Other Properties*

Appellant challenges testimony from Schultz that he tried to recover title to a number of Hart's properties that appellant or another entity jointly owned. After appellant objected on hearsay and relevance grounds, the trial court instructed the jury that the testimony was not asserted for the truth, but solely to explain Schultz's conduct. Again, appellant has not persuaded us that the limiting instruction was insufficient. (*McNally, supra,* 236 Cal.App.4th at pp. 1428–1429.)

14

Appellant failed to object below to testimony about litigation to recover title on Hart's other properties,[14] a 2006 police investigation into allegations of financial fraud in connection with Hart, and Hart's inability to recall what happened to almost half of the proceeds from the sale of her residence.[15]  The challenges are forfeited.

Schultz testified, during cross-examination, that he was told appellant continued to collect the rent from the Newhall property tenants after the conservatorship was in place. Defense counsel requested the testimony be limited to use for Schulz's state of mind, and the trial court agreed.  Appellant now argues the testimony was not relevant.  His failure to object on this ground below forfeits the challenge.  Appellant also points to a statement in the prosecutor's closing argument referring to appellant's collection of rents, arguing the prosecutor used the evidence for the truth despite the limiting instruction.  However, Hart testified without a limiting instruction that appellant collected rents at the Newhall property.  In any event, appellant did not object below to the closing argument statement.

D. *Evidence Regarding Hart's Move to Antioch*

Appellant challenges Dr. Nievod's testimony about Hart's move to Antioch and the isolating impact this had on her.  Appellant argues the testimony was hearsay and lacked foundation.  He did not raise these objections below and has forfeited them.

IV. *White Collar Crime Enhancement and Fine*

Appellant argues there was insufficient evidence to support the white collar crime enhancement.  He contends the only evidence connecting a monetary value to the properties at issue was that the loan from World Savings Bank was for $540,000.  He argues that after the trial court dismissed count 1, this value could no longer be used to support the enhancements or fine.  We disagree.

---

[14] The only defense objection was lack of foundation regarding testimony about the LLC created to develop the Newhall property.  Appellant does not renew this objection on appeal.

[15] After defense counsel objected to a prior question on hearsay grounds, the prosecutor rephrased the question before the trial court ruled on the objection.  Defense counsel did not renew the objection during the subsequent line of questioning.  We note also that Hart testified she did not know what happened to nearly half of the proceeds from the sale.

15

The white collar crime enhancement, section 186.11, provides: "Any person who commits two or more related felonies, a material element of which is fraud or embezzlement, which involve a pattern of related felony conduct, and the pattern of related felony conduct involves the taking of, or results in the loss by another person or entity of, more than one hundred thousand dollars ($100,000), shall be punished, upon conviction of two or more felonies in a single criminal proceeding, in addition and consecutive to the punishment prescribed for the felony offenses of which he or she has been convicted, by an additional term of imprisonment in the state prison as specified in paragraph (2) or (3). . . ." (§ 186.11, subd. (a)(1).)[16] The statute further provides that the additional prison term and penalties "shall not be imposed unless the facts set forth in subdivision (a) are charged in the accusatory pleading and admitted or found to be true by the trier of fact." (§ 186.11, subd. (b)(1).) The statute imposes a fine "not to exceed five hundred thousand dollars ($500,000) or double the value of the taking, whichever is greater," when the facts supporting the enhancement have been found true. (§ 186.11, subd. (c).) " 'The purpose of the aggravated white collar crime enhancement [is] to provide a mechanism for greater punishment for criminals who engage in a pattern of fraudulent activity that results in a large amount of accumulated takings.' " (*People v. Denman* (2013) 218 Cal.App.4th 800, 813.)

The parties dispute whether, after count 1 was dismissed, the loss to World Savings Bank charged in that count could still be considered for purposes of the white collar crime enhancement. We need not decide this issue. The enhancement applies where the felony conduct "*involves the taking of*, or results in the loss by another person or entity of, more than five hundred thousand dollars ($500,000) . . . ." (§ 186.11, subd. (a)(2), italics added.) In count 6, the jury found appellant guilty of embezzling "a loan in United States currency in the amount of Five Hundred Forty Thousand Dollars

---

[16] Section 186.11, subdivision (a)(2) provides: "If the pattern of related felony conduct involves the taking of, or results in the loss by another person or entity of, more than five hundred thousand dollars ($500,000), the additional term of punishment shall be two, three, or five years in the state prison."

($540,000) on [the Hercules property], the property of Rosia H[art] and World Savings Bank." The jury's conviction on this count is sufficient to support the enhancement, regardless of whether the loss to World Savings Bank could properly be considered: appellant's embezzlement of Hart's property involved the taking of $540,000. For similar reasons, appellant's arguments that World Savings Bank's loss is reduced because of his loan repayments and that Hart suffered no loss to her property are unavailing: the relevant analysis for our purposes is whether the criminal conduct involves the "taking of" property over $500,000.[17]

DISPOSITION

The judgment is affirmed.

---

[17] It is unclear whether appellant is also appealing the section 12022.6 enhancements. However, the trial court struck these enhancements under section 1385 and the People have not cross-appealed this ruling.

_____

SIMONS, J.

We concur.

_____

JONES, P.J.

_____

NEEDHAM, J.